**UNITED STATES of America, on its own behalf and on behalf of Reuben Mariano a/k/a Na tithl hi ya, Plaintiffs,**

v.

**Grace TSOSIE, Defendant.**

**No. CIV 92–1234 LH/DJS.**

United States District Court, D. New Mexico.

April 21, 1994.

Raymond Hamilton, Larry Gomez, U.S. Atty's. Office, D.N.M., Albuquerque, NM, for plaintiffs.

Paul E. Frye, Cynthia A. Kiersnowski, Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, NM, for defendant.

## MEMORANDUM OPINION

HANSEN, District Judge.

The issue before me in this matter is whether or not I should abstain *sua sponte*. All three parties oppose abstention. Having reviewed the record, briefs of the parties requested by the Court on this specific issue, and applicable case law, I conclude that I must consider the Indian abstention doctrine *sua sponte* and that, having done so, abstention and comity principles, as applied to the facts of this case, require me to abstain. Accordingly, I dismiss this federal court action without prejudice.

### I. *Historical and Procedural Background*

This is a civil action brought by the United States of America, on its own behalf, and on behalf of Reuben Mariano ("Mariano"), a/k/a Na tithl hi ya, a Navajo tribal member, against Grace Tsosie ("Tsosie"), another Navajo tribal member, for ejectment and damages for trespass on lands located within Crownpoint, New Mexico ("the land"), also known as Allotment No. 868.

The factual and procedural history surrounding this land is complicated, and in many aspects, disputed.

Mariano's claim to this land is primarily based on an allotment to Mariano when he was approximately four years old, approved in 1908 to 1910, under the authority of the General Allotment Act of 1887. It was not until 1964 that this land was granted to Mariano by Trust Patent Number 1237069.

Tsosie claims occupancy rights to this land based upon her assertion that her maternal ancestors have occupied this land continuously since 1868. In her counterclaim, Tsosie asserts that her mother, Asdzaa Chee or Bah Mary Arviso, was born and raised on the land and that her umbilical cord was buried there in 1901. Tsosie further asserts that the land was not patented to Mariano prior to January 15, 1917, at which time it was withdrawn under Executive Order 2513. This order reserved such land from "settlement and sale and [ ] set apart for the use and occupancy of the Navajo and such other Indians as the Secretary of the Interior may see fit to settle thereon." Tsosie claims that the Secretary of Interior settled Tsosie's ancestors on the land and that the Superintendent of the Eastern Navajo Agency authorized and affirmatively encouraged her parents to construct further improvements on the land. Tsosie was born on the land in 1929 and has lived there ever since. She asserts that these facts, among others, entitle her to a judgment declaring that she has unextinguished aboriginal occupancy rights to the land; a judgment declaring that she has rights pursuant to Executive Order 2513 to occupy, use, possess and enjoy the land to the exclusion of all others; a judgment declaring she has the rights to own, use, convey with the approval of the United States and obtain compensation for the surface and mineral estates; a judgment declaring that the United States has breached its fiduciary

duties to her; and, a judgment awarding her costs and attorney fees.

In addition to those above mentioned, there are other patents, land orders, executive orders, policies and conditions which have been imposed on this land since the 1800's. The Bureau of Indian Affairs ("BIA") has taken actions which are inconsistent, one with the next, as to who is entitled to possessory and ownership interest in the land. This case is but one example of how the BIA has mishandled land for the Indians. The facts of this case are a sad commentary on the incompetence to which Native Americans in this country have been long subjected.

For approximately four years after the 1964 patent to Mariano, Tsosie continued to possess the land without disruption. At that point, this protracted legal battle over the land began.

Perhaps in light of the 1964 patent, the United States required the Arvisos to obtain a homesite lease from Mariano as a condition of federal assistance. This lease was approved by the Superintendent of the Eastern Navajo Agency in 1968. In 1975, Arviso and Tsosie filed an action in the Navajo Tribal Court to enjoin Mariano and others from interfering with their use and occupancy of the land. That court issued a temporary restraining order in August of 1975, which restrained Mariano from building a fence on the land, and from any harassment or harm. The temporary restraining order was to remain in effect pending the settlement of the case. The case of *Bah Mary Arviso v. Mariano* was never settled.

In 1981, Mariano sued Bah Mary Arviso, the Navajo Area Director, and the Superintendent of the Eastern Navajo Agency in Navajo Tribal Court, seeking to eject Arviso from the land. The case was removed to federal court and then remanded back to tribal court after the two federal officials were dismissed by the federal court. Upon remand, on November 19, 1982, Mariano consented to dismissal without prejudice of his ejectment claim against Tsosie's mother.

In 1981, the 1968 lease was declared null and void by the BIA. Tsosie did not appeal this decision. In 1988, the BIA Superintendent of the Eastern Navajo Agency wrote to Tsosie, telling her she must move off the land within 90 days. Tsosie appealed this decision to the Area Director and to the Interior Board of Indian Appeals, which affirmed on July 9, 1991.[1] On September 26, 1991, the Acting Superintendent sent Tsosie a letter, directing her to move off the land, to restore it to its original condition and to remove all improvements, within 30 days. Tsosie did not respond and continues to occupy the land to this day. On November 2, 1992, Mariano filed this trespass and ejectment action in this Court.

## II. Discretion to Raise Indian Abstention Issue Sua Sponte

This Court has the authority to raise the abstention issue *sua sponte* under *Smith v. Moffett*, 947 F.2d 442 (10th Cir.1991). Tsosie argues that this Court is not required to raise the issue, however, and that it would be an abuse of discretion, under the circumstances in this case. In its discretion, the parties urge this Court to balance the desires of the parties and the advanced stage of the litigation, against the federal policy supporting tribal self-government, and to determine that this case should proceed to the merits in this Court, a result which in effect declines to raise and consider *sua sponte* the abstention issue.

At Tsosie's behest, I have considered the factors mentioned in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818–19, 96 S.Ct. 1236, 1246–47, 47 L.Ed.2d 483 (1976):

**A. History and Status of the Proceedings.** This matter was filed in this Court approximately 18 months ago. Even though this matter was set for trial, I have not made substantive decisions in this case, nor have I considered any except for this abstention issue. I am aware of the advanced age of the parties. As noted by Tsosie, although Mari-

---

1. During the interim, Tsosie was determined by the District Court of the Navajo Nation to be the heir to the homesite and its improvements. *In* *Re Estate of Bah Mary Arviso*, No. CR–CV–174–88 (Feb. 21, 1989).

ano is now in his nineties, he was similarly of advanced years in 1982, when he voluntarily dismissed his claim in tribal court, the last time this case was remanded from federal to tribal court. I note that this matter has been in litigation, of one sort or another, since 1968. I find that this Court has not itself caused any significant delay, relatively speaking, in the proceedings. Any delay occasioned by a remand·to tribal court should be insubstantial, especially compared with the delay directly caused by the parties themselves over the last 26 years.

**B. Relative Convenience of the Federal Forum.** Tsosie notes in her brief that the federal forum is more convenient for the lawyers and that the tribal forum is more convenient for the parties. Plaintiffs say nothing to the contrary, and I conclude that this factor does not weigh one way or the other.

**C. The Desirability of Avoiding Piecemeal Litigation.** Our Supreme Court has been clear that jurisdictional issues should be determined, in the first instance, in tribal court. *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987); *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). It makes no sense and would be grossly inefficient to try this case in this Court, only to find on a potential appeal, that the case should have been remanded to tribal court. I prefer to have this case proceed on the track and in the chronological order prescribed by our Supreme Court.

As Tsosie noted, Plaintiffs did not sue to quiet title under 25 U.S.C. § 345 or any other federal law causes of action; rather they sue in trespass and ejectment. This is the type of issue which is appropriately decided by a tribal court. I conclude that this. consideration is best served by a remand to the tribal court.

**D. Applicable Federal Policy.** As explained later in this opinion, great weight must be given to the federal policy encouraging tribal self-government and to the relationship of comity between the federal and tribal courts that this policy necessarily entails.

Having weighed the preferences of the parties and the advanced posture of this case against the strong federal policy supporting tribal self-government and the development of tribal courts, I do not find any compelling reason for this case to proceed to trial in this Court. I find that the *National Farmers* comity considerations outweigh the short-term considerations of these parties. *National Farmers* at 856, 105 S.Ct. at 2454.

Having weighed all relevant factors, I conclude that it is a proper decision for me to raise the abstention issue *sua sponte.*

**III. *Application of Tribal Exhaustion Rule***

The tribal exhaustion rule was created because of Congress' "strong interest in promoting tribal sovereignty, including the development of tribal courts." *See Smith v. Moffett* at 444. As recently noted by the Tenth Circuit in *Texaco, Inc. v. Zah,* the rule provides that "as a matter of comity, a federal court should not exercise jurisdiction over cases arising under its federal question or diversity jurisdiction, if those cases are also subject to tribal jurisdiction, until the parties have exhausted their tribal remedies." 5 F.3d 1374, 1376 (10th Cir.1993), *citing Tillett v. Lujan,* 931 F.2d 636, 640 (10th Cir.1991).[2] This Court is mindful of the three federal policy concerns behind the tribal exhaustion rule, as identified by the Supreme Court: (1) to further the congressional policy of supporting tribal self-government; (2) to promote the orderly administration of justice; and, (3) to obtain the benefit of tribal exper-

---

**2.** A review of the three exceptions to this general rule set forth in footnote 21 in *National Farmers* indicates that none would apply to change this presumption in the immediate case: (1) In that this issue is raised *sua sponte,* there is no argument that the assertion of tribal jurisdiction is "motivated by a desire to harass or is conducted in bad faith." (2) The parties in no way allege

that "the action is patently violative of express jurisdictional prohibitions." (3) This dispute has already moved from Navajo tribal court to federal district court and back to Navajo tribal court. There can be no argument that "exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction."

tise. *National Farmers*, 471 U.S. at 856–57, 105 S.Ct. at 2454.

"When the dispute is a 'reservation affair' ... there is no discretion not to defer." *Crawford v. Genuine Parts Co., Inc.*, 947 F.2d 1405, 1408 (9th Cir.1991). Because this issue is not strictly a "reservation affair," [3] I read the *Zah* case to require me to "examine assiduously the National Farmers factors in determining whether comity requires the parties to exhaust their tribal remedies before presenting their dispute to the federal courts." *Texaco, Inc. v. Zah* at 1378.

## A. *Furtherance of Congressional Policy Supporting Self–Government.*

The United States asserts that the Navajo Nation has no governmental interest in this action between individuals concerning possession of an off-reservation allotment and that tribal law cannot affect an alienation of

3. The land at issue in this case, an Indian allotment, while not on the reservation, is unquestionably Indian Country. *See Okla. Tax Comm. v. Sac and Fox Nation*, — U.S. —, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).

In 1985, the Navajo Tribal Council, by Resolution CJY–57–85, amended Navajo Trib.Code tit. 7, § 254, to clarify the definition of territorial jurisdiction. This was done in order to bring the definition of "Navajo Indian Country" in line with the federal definition of "Indian Country," found in recent federal case law interpreting 18 U.S.C. § 1151, which explicitly includes certain off-reservation lands as well as rights-of-way for roads and highways. The Navajo Tribal Code was amended to define Navajo Indian Country as:

> [a]ll land within the exterior boundaries of the Navajo Indian Reservation or of the Eastern Navajo Agency, all land within the limits of dependent Navajo Indian communities, *all Navajo Indian allotments*, and all other land held in trust for, owned in fee by, or leased by the United States to the Navajo Tribe or any Band of Navajo Indians.

Navajo Trib.Code tit. 7, § 254 (1986) (emphasis added).

Indian Country is defined in 18 U.S.C. § 1151 as:

> (a) [a]ll land within the limits of any Indian reservation under the jurisdiction of the United States Government ... (b) all dependent Indian communities within the borders of the United States, ... and (c) *all Indian allotments, the Indian titles to which have not been extinguished*, including rights-or-way running through the same.

(Emphasis added).

this property right. The United States argues that a very real cost of transferring this case to the tribal court may be that Plaintiff is deprived of an adjudication by the forum of choice unless the tribal court has no jurisdiction. The United States further argues that this area of law is preempted by Congress. I have carefully reviewed the tribal court opinion of *Benally v. John*, 4 Navajo Rptr. 39 (1983), which the United States has submitted in support of these arguments. I note that this opinion pre-dates *LaPlante* and *National Farmers*. I am unaware of any tribal court opinion on this issue which has been rendered since *National Farmers* was written in 1985. Contrary to assertions of Plaintiffs, as explained more fully later in this opinion, my reading of *Benally* actually strengthens my conclusion of the necessity of abstention for purposes of clarification by the tribal court.[4]

Mariano asserts that

> The Tenth Circuit noted in the *Zah* opinion that this definition, although found in the Major Crimes Act, applies to questions of both criminal and civil jurisdiction. *Id.* at 1377.
> Defendant Tsosie is a resident of Navajo Indian Country and is subject therefore to Navajo court civil jurisdiction, as is the land itself:
> > Generally, the Navajo Tribal Code defines Navajo court civil jurisdiction to reach "[a]ll civil actions in which the defendant is a resident of Navajo Indian Country, or has caused an action to occur within the territorial jurisdiction of the Navajo Nation." Navajo Trib.Code tit. 7, § 253(2) (1986). The territorial jurisdiction of the Navajo Nation is defined to be coextensive with Navajo Indian Country. *Id.* § 254.
> *Texaco, Inc. v. Zah*, 5 F.3d at 1377.

4. *Benally v. John* involved allotment land which was transferred between individuals allegedly as a result of fraud and undue influence. The *Benally* case considered the question of whether the allotment jurisdiction statute, 25 U.S.C. § 345, preempts tribal court action. *Citing* F. Cohen, *Handbook of Federal Indian Law* at 343 (1982), the tribal court concluded that "that question is uncertain." *Benally* at 41. *Benally* noted that 25 U.S.C. § 345 provides that an Indian "may" bring an action in a United States district court and that such courts have jurisdiction. *Id.* at 42–43. The tribal court reviewed the history of allotment lands and mentioned that, pending future clarification, especially in allotment actions where the United States would have to be a party, Navajo courts should defer to the United States as a matter of comity. *Benally* went on to note that allotment actions involving the United States are not the only remedy available to an

[F]or this Court to abstain in this case would be to hand the Tribal Court a matter which is the complex interweave of Federal issues, most of which it has no jurisdiction to adjudicate. That is an invitation to confusion and delay, and the possible miscarriage of justice of the rights of private litigants.

(Brief in Opposition to Federal Court Abstention at 2).

I am not persuaded by these arguments.

At the outset, I note that Plaintiffs did not bring this action under federal statute, but rather, under common law theories of trespass and ejectment. To determine whether there has been trespass and whether ejectment would be appropriate, ownership rights to this land will have to be determined. This will involve an analysis of the effect, if any, tribal custom and common law have upon rights to land which may have been granted by the federal allotment procedure.[5] The effect of reliance by Tsosie and by her ancestors, upon representations and actions of the BIA, may be relevant. I conclude that affording the tribal court the opportunity of initial consideration of these issues best comports with the admonition in the *LaPlante* case and its progeny, that the determination of jurisdiction should be made in the first instance in the tribal court.

The United States tries to characterize this case as one which must be heard in federal court, arguing in part that the tribal court does not have jurisdiction to adjudicate all issues in this case. This argument fails for several reasons.

As noted above, Plaintiffs did not plead a cause of action under 25 U.S.C. § 345, entitled "Actions for allotments." Despite this

fact, I recognize that such issues as whether the land has current status as an allotment, and, if so, who has what rights to said allotment, must be determined, and that this statute will come into play at that juncture. The language of the statute says that "said district courts are given jurisdiction to try and determine any action, suit or proceeding arising within their respective jurisdictions involving the right of any person ... to any allotment of land under any law or treaty...."

I do not read this statute as granting district courts jurisdiction which is exclusive of all other courts that would have otherwise had jurisdiction. I do not read the plain language of this statute to say that I am obligated to hear this case.

Indian nations and the United States government are dual sovereigns. Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status. *See United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). "[T]ribal sovereignty furnishes the backdrop against which all federal Indian laws are to be read." F. Cohen, *Handbook of Federal Indian Law* at 232 (1982). Although Congress has plenary power to define the jurisdiction of tribal courts, it did not exercise that power, when it drafted Section 345, to preclude concurrent jurisdiction in the tribal court. *See United States v. Plainbull*, 957 F.2d 724 (9th Cir.1992). Further, a tribal court, presumably, is as competent to interpret federal law as it is state law. *See Iowa Mut.* at 19.

I do not find that my conclusion that the tribal court has jurisdiction over Section 345

---

individual. As in the instant case, the *Benally* court characterized that case as one where action upon one individual by another is demanded. *Benally* characterized that case as one which "involve[d] a Navajo court applying Navajo law to Navajo parties to settle a Navajo dispute. The Treaty of 1868 and the pledge of the United States to respect preexisting Navajo sovereignty means nothing if Navajo affairs cannot be settled by Navajo courts." *Id.* at 44. *Benally* concluded that the tribal court had jurisdiction.

**5.** It is at this juncture that this Court is presented with an almost insurmountable dilemma. As

discussed in the section below entitled, "Benefits of Tribal Expertise," this case will necessarily involve unwritten elements of Navajo culture, surrounding rights to land, which compose the Navajo common law. Although I can hear testimony about these elements, this places me in the position of having a witness instruct me on the applicable law. Because essential elements of the law may be unwritten, I might be forced to rely on the legal conclusions of others. From a legal standpoint, I believe this invades my function and responsibility as a trial judge and would be improper.

actions conflicts with the conclusion of the Court of Appeals of the Navajo Nation. *Benally* at 43 ("It would appear to us that we do indeed have jurisdiction over Sec. 345 actions, but we will defer that question for a later ruling . . .") Eleven years ago, *Benally* left open, pending future clarification, the issue of propriety of action by that court on actions directly arising under Section 345. *Benally* concluded by holding:

> The limits of this holding are that the Navajo courts will not directly deal with allotment titles until the law is further clarified, try title to allotted land or attempt to compel United States officials to transfer it, but in any action where action upon the person only is demanded, our courts may act.

Following *National Farmers*, in the time since *Benally* was written, the law has expanded considerably in the Indian exhaustion area. The Navajo Tribal Code section which defines Navajo Indian Country as including allotments, was amended in 1985, two years after *Benally* was written. This Court is unaware whether the law has been further clarified, by the Navajo attorney general, as anticipated by the *Benally* court, in which case the tribal court would be more inclined to "directly deal with allotment titles." I note that in any event, the instant case is covered under the *Benally* rationale and holding, which deemed action by the tribal court to be appropriate, because the complaint of the plaintiffs seeks "action upon the person only." In light of all of these factors, I believe that a remand of this case to the tribal court will give that court the very opportunity to develop Indian law and exercise self government, as encouraged by *National Farmers* and its progeny.

### B. *Promotion of the Orderly Administration of Justice.*

I conclude that my decision to require exhaustion of tribal remedies will promote the orderly administration of justice. Otherwise, this Court would be asked to consider the application of tribal common law. As explained more fully below, this is a subject matter far better addressed by the tribal court's expertise.

I believe the risk of prolonging this procedural nightmare will be minimized if this Court stays its hand until after the tribal court has had a full opportunity to determine its own jurisdiction and to explain the precise basis for accepting or rejecting jurisdiction.

### C. *Benefits of Tribal Expertise.*

Defendant bases her claim to the land, in part, upon Navajo custom and tradition, as related to facts surrounding occupancy of the land by her maternal ancestors. To substantiate her claim, Defendant has attached the sworn Declaration of Tom Tso to her summary judgment pleadings. (*See* Reply to Plaintiff's Memorandum in Opposition to Defendant Grace Tsosie's Motion for Summary Judgment). As former Chief Justice of the Navajo Nation Supreme Court, Justice Tso states that he is familiar with Navajo custom, tradition, history, culture and common law. In his declaration, Justice Tso recites the facts of occupancy of this land as he understands them. He states:

> 7. The Navajo culture historically did not employ writings to codify the rules which governed Navajo society. However, many of the cultural traditions and values are strong enough and important enough to the preservation of a balanced and harmonious Navajo society to have the force of law, equivalent to a statute or even a constitutional provision in United States laws. These traditions, values and related rights and obligations are viewed by the Navajo people as sacred because they are rooted in religious songs, prayers and chants. These foundations of the Navajo way constitute Navajo common law.

Justice Tso mentions that Tsosie's rights to the land are based upon the consensus of her maternal ancestors and states that this is a principle equivalent to *res judicata*. He says that the burying of one's umbilical cord on land has "profound significance," signifying a tie to Mother Earth. He states:

> 16. Relocating traditional Navajos from the land where their umbilical cords are buried and where they have always lived is uprooting them from their religion, and from a central part of their own identities. There are no precise analogies in the non-

Navajo society of which I am aware to describe the harm that such relocation causes. It would be like yanking an infant away from its mother when the infant is still screaming and the mother is reaching for it, and the mother is killed of loneliness and the child is killed for lack of tenderness and sustenance. It is tantamount to separating the Navajo from her spirit.

As a non-Navajo, unschooled in the foundations of Navajo culture which, according to Justice Tso, constitute Navajo common law, I am unqualified to interpret the law and rule on many of the legal issues which should arise in this case. As noted in the *LaPlante* case, tribal courts are best qualified to interpret and apply tribal law. *LaPlante*, 480 U.S. at 18, 107 S.Ct. at 977–78. I believe this is the very type of case which the Supreme Court had in mind in *LaPlante* and *National Farmers*, when it mandated that federal courts abstain in order to allow tribal courts the opportunity to fully develop their own common law.

## IV.  CONCLUSION

Based upon the foregoing, I conclude that exhaustion of tribal remedies is required before this claim and counterclaim may be entertained by a federal court. Accordingly, abstention is within my discretion and is the most appropriate action. This case will be dismissed without prejudice.