# IOWA MUTUAL INSURANCE CO. *v.* LaPLANTE ET AL.

No. 85–1589.   Argued December 1, 1986—Decided February 24, 1987

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 20.

*Maxon R. Davis* argued the cause and filed briefs for petitioner.

*Joe Bottomly* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Richard G. Taranto,* and *Edward J. Shawaker;* for the Blackfeet Tribe of Indians by *Jeanne S. Whiteing;* and for the Navajo Nation Tribe of Indians et al. by *Claudeen Bates Arthur, Yvonne T. Knight,* and *W. Richard West, Jr.*

JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner, an Iowa insurance company, brought this action in Federal District Court against members of the Blackfeet Indian Tribe resident on the Tribe's reservation in Montana. The asserted basis for federal jurisdiction was diversity of citizenship. At the time the action was initiated, proceedings involving the same parties and based on the same dispute were pending before the Blackfeet Tribal Court. The question before us is whether a federal court may exercise diversity jurisdiction before the tribal court system has an opportunity to determine its own jurisdiction.

I

Respondent Edward LaPlante, a member of the Blackfeet Indian Tribe, was employed by the Wellman Ranch Company, a Montana corporation. The Wellman Ranch is located on the Blackfeet Indian Reservation and is owned by members of the Wellman family, who are also Blackfeet Indians residing on the Reservation. Petitioner Iowa Mutual Insurance Company was the insurer of the Wellman Ranch and its individual owners.

On May 3, 1982, LaPlante was driving a cattle truck within the boundaries of the Reservation. While proceeding up a hill, he lost control of the vehicle and was injured when the truck "jackknifed." Agents of Midland Claims Service, Inc., an independent insurance adjuster which represented Iowa Mutual in this matter, attempted unsuccessfully to settle LaPlante's claim. In May 1983, LaPlante and his wife Verla, also a Blackfeet Indian, filed a complaint in the Blackfeet Tribal Court. The complaint stated two causes of action: the first named the Wellman Ranch and its individual owners as defendants and sought compensation for LaPlante's personal injuries and his wife's loss of consortium; the second alleged a claim for compensatory and punitive damages against Iowa Mutual and Midland Claims for bad-faith refusal to settle.

Iowa Mutual and Midland Claims moved to dismiss for failure properly to allege Tribal Court jurisdiction and for lack of jurisdiction over the subject matter of the suit. The Tribal Court dismissed the complaint for failure to allege the factual basis of the court's jurisdiction, but it allowed the LaPlantes to amend their complaint to allege facts from which jurisdiction could be determined. The Tribal Court also addressed the issue of subject-matter jurisdiction, holding that the Tribe could regulate the conduct of non-Indians engaged in commercial relations with Indians on the reservation. Since the Tribe's adjudicative jurisdiction was coextensive with its legislative jurisdiction, the court concluded that it would have jurisdiction over the suit.[1] Although the Blackfeet Tribal Code establishes a Court of Appeals, see ch. 11, § 1, it does not allow interlocutory appeals from jurisdictional rulings. Accordingly, appellate review of the Tribal Court's jurisdiction can occur only after a decision on the merits.

Subsequent to the Tribal Court's jurisdictional ruling, Iowa Mutual filed the instant action in Federal District Court against the LaPlantes, the Wellmans, and the Wellman Ranch Company,[2] alleging diversity of citizenship under 28

---

[1] Iowa Mutual and Midland Claims renewed their motions to dismiss for lack of subject-matter jurisdiction after the LaPlantes amended their complaint to set forth the factual bases for the Tribal Court's jurisdiction. The Tribal Court summarily denied the motions. Brief for United States as *Amicus Curiae* 3–4.

[2] Midland Claims also initiated a federal action against the LaPlantes in which Iowa Mutual intervened as a plaintiff. The companies sought a declaratory judgment that the Tribal Court lacked jurisdiction over the La-Plantes' claim of bad-faith refusal to settle, as well as an injunction barring further proceedings in the Tribal Courts. The jurisdictional basis for this suit was 28 U. S. C. § 1331. The District Court dismissed this suit for failure to state a claim and both companies appealed. While the appeal was pending, this Court decided *National Farmers Union Ins. Cos.* v. *Crow Tribe,* 471 U. S. 845 (1985). The Court of Appeals for the Ninth Circuit remanded the action to the District Court for reconsideration in light of *National Farmers Union.* On remand, the District Court dismissed the action without prejudice, pending exhaustion of tribal court remedies. That decision is not before us.

U. S. C. § 1332 as the basis for federal jurisdiction. Iowa Mutual sought a declaration that it had no duty to defend or indemnify the Wellmans or the Ranch because the injuries sustained by the LaPlantes fell outside the coverage of the applicable insurance policies.[3] The LaPlantes moved to dismiss the action for lack of subject-matter jurisdiction and the District Court granted the motion. Relying on *R. J. Williams Co.* v. *Fort Belknap Housing Authority,* 719 F. 2d 979 (CA9 1983), the court held that the Blackfeet Tribal Court must first be given an opportunity to determine its own jurisdiction. The District Court noted that the Montana state courts lack jurisdiction over comparable suits filed by Montana insurance companies;[4] it indicated that its jurisdiction was similarly precluded because, based on its reading of *Woods* v. *Interstate Realty Co.,* 337 U. S. 535, 538 (1949), federal courts sitting in diversity operate solely as adjuncts to the state court system. The District Court held that "[o]nly if the Blackfeet Tribe decides not to exercise its exclusive jurisdiction . . . would this court be free to entertain" the case under 28 U. S. C. § 1332.

The Court of Appeals for the Ninth Circuit affirmed the District Court's order. 774 F. 2d 1174 (1985). It found *R. J. Williams Co.* v. *Fort Belknap Housing Authority, supra,* to be consistent with this Court's intervening decision

---

[3] Iowa Mutual also asserted lack of coverage as an affirmative defense in its answer to respondents' amended Tribal Court complaint. See Reply Brief for Petitioner 1, n. 1.

[4] A federal statute, Pub. L. 280, originally allowed States to assume civil jurisdiction over reservation Indians without tribal consent, but Montana did not take such action with respect to the Blackfeet Tribe. See *Kennerly* v. *District Court,* 400 U. S. 423 (1971). Tribal consent is now a prerequisite to the assumption of jurisdiction, see 25 U. S. C. § 1326, and the Blackfeet Tribe has not consented to state jurisdiction. Petitioner does not contend that the Montana state courts would have jurisdiction over the dispute. Brief for Petitioner 5 and 7; see *Milbank Mutual Ins. Co.* v. *Eagleman,* 218 Mont. 35, 705 P. 2d 1117 (1985) (Montana state courts lack subject-matter jurisdiction over suit between Indian and non-Indian arising out of on-reservation conduct).

in *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471
U. S. 845 (1985). Quoting *id.*, at 857, the Court of Appeals
concluded: "We merely permit the tribal court to initially de-
termine its own jurisdiction. The tribal court's determina-
tion can be reviewed later 'with the benefit of [tribal court]
expertise in such matters.'" App. to Pet. for Cert. 5a–6a.
We granted certiorari. 476 U. S. 1139 (1986).

## II

We have repeatedly recognized the Federal Government's
longstanding policy of encouraging tribal self-government.
See, *e. g., Three Affiliated Tribes* v. *Wold Engineering*, 476
U. S. 877, 890 (1986); *Merrion* v. *Jicarilla Apache Tribe*,
455 U. S. 130, 138, n. 5 (1982); *White Mountain Apache
Tribe* v. *Bracker*, 448 U. S. 136, 143–144, and n. 10 (1980);
*Williams* v. *Lee*, 358 U. S. 217, 220–221 (1959).[5] This policy
reflects the fact that Indian tribes retain "attributes of
sovereignty over both their members and their territory,"
*United States* v. *Mazurie*, 419 U. S. 544, 557 (1975), to the
extent that sovereignty has not been withdrawn by federal
statute or treaty. The federal policy favoring tribal self-
government operates even in areas where state control has
not been affirmatively pre-empted by federal statute. "[A]b-
sent governing Acts of Congress, the question has always
been whether the state action infringed on the right of res-
ervation Indians to make their own laws and be ruled by
them." *Williams* v. *Lee, supra*, at 220.

Tribal courts play a vital role in tribal self-government,
cf. *United States* v. *Wheeler*, 435 U. S. 313, 332 (1978), and
the Federal Government has consistently encouraged their

---

[5] Numerous federal statutes designed to promote tribal government
embody this policy. See, *e. g.*, 25 U. S. C. §§ 450, 450a (Indian Self-
Determination and Education Assistance Act); 25 U. S. C. §§ 476–479 (In-
dian Reorganization Act); 25 U. S. C. §§ 1301–1341 (Indian Civil Rights
Act).

development.[6]    Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, see *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191 (1978), their civil jurisdiction is not similarly restricted.    See *National Farmers Union, supra,* at 854–855, and nn. 16 and 17.    If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law.    See *Fisher* v. *District Court,* 424 U. S. 382 (1976); *Williams* v. *Lee, supra.*

A federal court's exercise of jurisdiction over matters relating to reservation affairs can also impair the authority of tribal courts, as we recognized in *National Farmers Union.*[7]    In that case, a Tribal Court had entered a default judgment against a school district for injuries suffered by an Indian child on school property.    The school district and its insurer sought injunctive relief in District Court, invoking 28 U. S. C. § 1331 as the basis for federal jurisdiction and claiming that the Tribal Court lacked jurisdiction over non-Indians.    The District Court agreed and entered an injunction against execution of the Tribal Court's judgment, but the Court of Appeals reversed, holding that the District Court lacked jurisdiction.    We refused to foreclose tribal court jurisdiction over a civil dispute involving a non-Indian.    471 U. S., at 855.    We concluded that, although the existence of tribal court jurisdiction presented a federal question within the scope of 28 U. S. C. § 1331, considerations of comity direct that tribal remedies be exhausted before the question is addressed by the District Court.    471 U. S., at 857.    Promotion of tribal self-government and self-determination re-

---

[6] For example, Title II of the Indian Civil Rights Act provides "for the establishing of educational classes for the training of judges of courts of Indian offenses."    25 U. S. C. § 1311(4).

[7] See also *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 60 (1978) (providing a federal forum for claims arising under the Indian Civil Rights Act interferes with tribal autonomy and self-government).

quired that the Tribal Court have "the first opportunity to evaluate the factual and legal bases for the challenge" to its jurisdiction. *Id.*, at 856. We remanded the case to the District Court to determine whether the federal action should be dismissed or stayed pending exhaustion of the remedies available in the tribal court system.[8] *Id.*, at 857.

Although petitioner alleges that federal jurisdiction in this case is based on diversity of citizenship, rather than the existence of a federal question, the exhaustion rule announced in *National Farmers Union* applies here as well. Regardless of the basis for jurisdiction, the federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a "full opportunity to determine its own jurisdiction." *Ibid.* In diversity cases, as well as federal-question cases, unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs. See *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 59 (1978); see also *Fisher* v. *District Court, supra,* at 388. Adjudication of such matters by any nontribal court also infringes upon tribal lawmaking authority, because tribal courts are best qualified to interpret and apply tribal law.

As *National Farmers Union* indicates, proper respect for tribal legal institutions requires that they be given a "full opportunity" to consider the issues before them and "to rectify any errors." 471 U. S., at 857. The federal policy of promoting tribal self-government encompasses the develop-

---

[8] As the Court's directions on remand in *National Farmers Union* indicate, the exhaustion rule enunciated in *National Farmers Union* did not deprive the federal courts of subject-matter jurisdiction. Exhaustion is required as a matter of comity, not as a jurisdictional prerequisite. In this respect, the rule is analogous to principles of abstention articulated in *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800 (1976): even where there is concurrent jurisdiction in both the state and federal courts, deference to state proceedings renders it appropriate for the federal courts to decline jurisdiction in certain circumstances. In *Colorado River,* as here, strong federal policy concerns favored resolution in the nonfederal forum. See *id.*, at 819.

ment of the entire tribal court system, including appellate courts. At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts. In this case, the Tribal Court has made an initial determination that it has jurisdiction over the insurance dispute, but Iowa Mutual has not yet obtained appellate review, as provided by the Tribal Code, ch. 1, § 5. Until appellate review is complete, the Blackfeet Tribal Courts have not had a full opportunity to evaluate the claim and federal courts should not intervene.

Petitioner argues that the statutory grant of diversity jurisdiction overrides the federal policy of deference to tribal courts. We do not agree. Although Congress undoubtedly has the power to limit tribal court jurisdiction,[9] we do not read the general grant of diversity jurisdiction to have implemented such a significant intrusion on tribal sovereignty, any more than we view the grant of federal-question jurisdiction, the statutory basis for the intrusion on tribal jurisdiction at issue in *National Farmers Union*, to have done so. The diversity statute, 28 U. S. C. § 1332, makes no reference to Indians and nothing in the legislative history suggests any intent to render inoperative the established federal policy promoting tribal self-government. Tribal courts in the Anglo-American mold were virtually unknown in 1789 when Congress first authorized diversity jurisdiction, see Judiciary Act of 1789, § 11, 1 Stat. 78–79; and the original statute did not manifest a congressional intent to limit tribal sovereignty. Moreover, until the late 19th century, most Indians were neither considered citizens of the States in which their reservation was located, nor regarded as citizens of a foreign State, see, *e. g., Cherokee Nation* v. *Georgia,* 5 Pet. 1, 15–18 (1831); *Elk* v. *Wilkins,* 112 U. S. 94, 102–103 (1884), so a suit to which Indians were parties would not have satis-

---

[9] "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Santa Clara Pueblo* v. *Martinez, supra,* at 56. See generally F. Cohen, Handbook of Federal Indian Law 207–216 (1982).

fied the statutory requirements for diversity jurisdiction.[10] Congress has amended the diversity statute several times since the development of tribal judicial systems,[11] but it has never expressed any intent to limit the civil jurisdiction of the tribal courts.

Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. See *Montana* v. *United States*, 450 U. S. 544, 565–566 (1981); *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 152–153 (1980); *Fisher* v. *District Court*, 424 U. S., at 387–389. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute. "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . . remains intact." *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S., at 149, n. 14. See also *Santa Clara Pueblo* v. *Martinez, supra,* at 60 ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent"). In the absence of any indication that Congress intended the diversity statute to limit the jurisdiction of the tribal courts, we decline petitioner's invitation to hold that tribal sovereignty can be impaired in this fashion.

Petitioner also contends that the policies underlying the grant of diversity jurisdiction—protection against local bias and incompetence—justify the exercise of federal jurisdiction

---

[10] In 1924, Congress declared that all Indians born in the United States are United States citizens, see Act of June 2, 1924, ch. 233, 43 Stat. 253, now codified at 8 U. S. C. § 1401, and, therefore, under the Fourteenth Amendment, Indians are citizens of the States in which they reside. There is no indication that this grant of citizenship was intended to affect federal protection of tribal self-government.

[11] The most recent amendment occurred in 1976. See Act of Oct. 21, 1976, Pub. L. 94–583, § 3, 90 Stat. 2891.

in this case. We have rejected similar attacks on tribal court jurisdiction in the past. See, *e. g.*, *Santa Clara Pueblo v. Martinez*, 436 U. S., at 65, and n. 21. The alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement established in *National Farmers Union*, 471 U. S., at 856, n. 21,[12] and would be contrary to the congressional policy promoting the development of tribal courts. Moreover, the Indian Civil Rights Act, 25 U. S. C. § 1302, provides non-Indians with various protections against unfair treatment in the tribal courts.

Although petitioner must exhaust available tribal remedies before instituting suit in federal court, the Blackfeet Tribal Courts' determination of tribal jurisdiction is ultimately subject to review. If the Tribal Appeals Court upholds the lower court's determination that the tribal courts have jurisdiction, petitioner may challenge that ruling in the District Court. See *National Farmers Union, supra*, at 853. Unless a federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised by the La-Plantes' bad-faith claim and resolved in the Tribal Courts.

## III

The Court of Appeals correctly recognized that *National Farmers Union* requires that the issue of jurisdiction be resolved by the Tribal Courts in the first instance. However, the court should not have affirmed the District Court's dis-

---

[12] In *National Farmers Union*, we indicated that exhaustion would not be required where "an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of adequate opportunity to challenge the court's jurisdiction." 471 U. S., at 856, n. 21 (citation omitted). While petitioner contends that tribal court jurisdiction over outsiders "is questionable at best," Reply Brief for Petitioner 6, it does not argue that the present action is "patently violative of express jurisdictional prohibitions," nor do we understand it to invoke any of the other exceptions enumerated in *National Farmers Union*.

missal for lack of subject-matter jurisdiction.[13]   Accordingly, we reverse and remand for further proceedings consistent with this opinion.[14]

*It is so ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

The complaint filed by petitioner in the United States District Court for the District of Montana raised questions concerning the coverage of the insurance policy that petitioner had issued to respondents Wellman Ranch Co. and its owners.   Complaint ¶¶ 8, 9 (App. 3–4).   It did not raise any question concerning the jurisdiction of the Blackfeet Tribal Court.   For purposes of our decision, it is therefore appropriate to assume that the Tribal Court and the Federal District Court had concurrent jurisdiction over the dispute. The question presented is whether the Tribal Court's jurisdiction is a sufficient reason for requiring the federal court to decline to exercise its own jurisdiction until the Tribal Court has decided the case on the merits.   In my opinion it is not.

---

[13] See n. 8, *supra.*

The Court of Appeals also relied on *Woods* v. *Interstate Realty Co.*, 337 U. S. 535 (CA9 1949), as a basis for dismissal.   Following its earlier decision in *R. J. Williams Co.* v. *Fort Belknap Housing Authority*, 719 F. 2d 979, 982 (1983), the court held that diversity jurisdiction would be barred as long as the courts of the State in which the federal court sits would not entertain the suit, apparently assuming that the exercise of federal jurisdiction would contravene a substantive state policy.   However, it is not clear that Montana has such a policy, since state-court jurisdiction seems to be precluded by the application of the *federal* substantive policy of non-infringement, rather than any *state* substantive policy.   See, *e. g.*, *Milbank Mutual Ins. Co.* v. *Eagleman*, 218 Mont. 35, 705 P. 2d 1117 (1985).

[14] On remand, the District Court should consider whether, on the facts of this case, the federal action should be stayed pending further Tribal Court proceedings or dismissed under the prudential rule announced in *National Farmers Union.*

A federal court must always show respect for the jurisdiction of other tribunals. Specifically, only in the most extraordinary circumstances should a federal court enjoin the conduct of litigation in a state court or a tribal court. Thus, in *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845 (1985), we held that the Federal District Court should not entertain a challenge to the jurisdiction of the Crow Tribal Court until after petitioner had exhausted its remedies in the Tribal Court. Our holding was based on our belief that Congress' policy of supporting tribal self-determination "favors a rule that will provide the forum *whose jurisdiction is being challenged* the first opportunity to evaluate the factual and legal bases for the challenge." *Id.*, at 856 (emphasis added; footnote omitted). We have enforced a similar exhaustion requirement in cases challenging the jurisdiction of state tribunals. See, *e. g., Juidice* v. *Vail*, 430 U. S. 327, 335–336 (1977).

The deference given to the deliberations of tribal courts on the merits of a dispute, however, is a separate matter as to which *National Farmers Union* offers no controlling precedent. Indeed, in holding that exhaustion of the tribal jurisdictional issue was necessary, we explicitly contemplated later federal-court consideration of the merits of the dispute. We noted that "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." 471 U. S., at 856 (footnote omitted). I see no reason why tribal courts should receive more deference on the merits than state courts. It is not unusual for a state court and a federal court to have concurrent jurisdiction over the same dispute. In some such cases it is appropriate for the federal court to stay its hand until the state-court litigation has terminated, see, *e. g., Colorado River Water Conservation District* v. *United States*, 424 U. S. 800, 813–816 (1976), but as we have consistently held, "[a]bstention from the exercise

of federal jurisdiction is the exception, not the rule." *Id.*, at 813. The mere fact that a case involving the same issue is pending in another court has never been considered a sufficient reason to excuse a federal court from performing its duty "to adjudicate a controversy properly before it." *County of Allegheny* v. *Frank Mashuda Co.*, 360 U. S. 185, 188 (1959). On the contrary, as between state and federal courts, the general rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . ." *McClellan* v. *Carland*, 217 U. S. 268, 282 (1910). In this case a controversy concerning the coverage of the insurance policy issued to respondents Wellman Ranch Co. and its owners by petitioner is properly before the Federal District Court.\* That controversy raises no question concerning the jurisdiction of the Blackfeet Tribal Court.

Adherence to this doctrine, by allowing the declaratory judgment action to proceed in District Court, would imply no disrespect for the Blackfeet Tribe or for its judiciary. It would merely avoid what I regard as the anomalous suggestion that the sovereignty of an Indian tribe is in some respects greater than that of the State of Montana, for example.

Until today, we have never suggested that an Indian tribe's judicial system is entitled to a greater degree of deference than the judicial system of a sovereign State. Today's opinion, however, requires the federal court to avoid adjudicating the merits of a controversy also pending in tribal court although it could reach those merits if the case instead were pending in state court. Thus, although I of course agree with the Court's conclusion that the Federal District Court had subject-matter jurisdiction over the case, I respectfully dissent from its exhaustion holding.

---

\*The Court seems to assume that the merits of this controversy are governed by "tribal law." See *ante*, at 16. I express no opinion on this choice-of-law question.