Martha **WILLIAMS–WILLIS,** Plaintiff,

v.

**CARMEL FINANCIAL CORPORATION, and Fictitious Defendants "A", "B" and "C"; Whether Singular or Plural, Those Other Persons, Corporations, Firms, or Other Entities Whose Wrongful Conduct Caused or Contributed to Cause the Injuries and Damages to the Plaintiff, All of Whose True and Correct Names are Unknown to Plaintiff at this Time, But Will be Substituted by Amendment When Ascertained, Defendants.**

No. CIV. A. 4:00CV171LN.

United States District Court,
S.D. Mississippi,
Eastern Division.

Feb. 20, 2001.

Carl Bryant Rogers, Roth, Van Amberg, Rogers, Ortiz, Fairbanks & Yepa, LLP, Santa Fe, NM, Brian D. Dover, Jordan & Dover, Philadelphia, MS, for Plaintiff.

Vann Fredric Leonard, Vann F. Leonard, Jackson, MS, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

Plaintiff Martha Williams–Willis has filed a motion to dismiss, or alternatively, to remand this case to the Tribal Court of the Mississippi Band of Choctaw Indians (Choctaw Tribal Court), from which it was removed by defendant Carmel Financial Corporation (Carmel). Carmel has responded in opposition to the motion, and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that plaintiff's motion is well taken and should be granted.

On August 23, 1996, plaintiff, an enrolled member of the Mississippi Band of Choctaw Indians, purchased a satellite dish for her home on the Choctaw Reservation, which she financed through a credit card issued by Dow Financial, a credit service of AMcore Consumer Finance Co., Inc. Subsequently, Carmel entered into an asset purchase agreement with AMcore which covered certain installment contracts for satellite dishes, including plaintiff's. Thereafter, on August 18, 2000,

plaintiff filed this lawsuit in the Choctaw Tribal Court seeking damages and injunctive relief based on allegations that the salesman who solicited her purchase of the satellite system concealed and fraudulently failed to disclose material information regarding the credit transaction, including the nature of the credit, the number of payments, the amount of each payment, the amount financed, the total finance charge, the total of payments and the total sales price. On October 11, 2000, Carmel removed the case to this court on the basis of federal question jurisdiction, asserting that plaintiff's allegations stated claims arising under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*

■ In her motion to remand, plaintiff contends that defendant's removal, purported to have been effected pursuant to 28 U.S.C. § 1441, is improper inasmuch as § 1441 provides only for removal from a "state court" and does not authorize removal from tribal court. Indeed, as plaintiff notes, the courts and commentators that have addressed this issue have concluded that § 1441 does not allow for removal from tribal court. *See Weso v. Menominee Indian School Dist.*, 915 F.Supp. 73, 76 (E.D.Wis.1995) (concluding that "the statutory language of 28 U.S.C. § 1441(a) limiting removal to actions commenced in 'State courts' does not extend to an action originally commenced in [tribal court]. When Congress intended to extend § 1441 to an entity other than courts of the fifty states, it has done so expressly."); *Gourneau v. Love*, 915 F.Supp. 150, 152–53 (D.N.D.1994) ("Congress has never enacted legislation either bringing tribal courts within the meaning of 'state court' in

§ 1441 or separately authorizing the removal of actions brought in tribal courts. To the extent that this is a close question, it must be resolved against removal in light of the United States Supreme Court's ... strong policy that federal courts should, as a matter of comity, permit actions commenced in Tribal court to proceed there."); *White Tail v. Prudential Ins. Co. of America*, 915 F.Supp. 153–54 (D.N.D.1995) ("[T]here is no ambiguity in the text of 28 U.S.C. § 1441; it refers specifically to state courts and to state courts only. The court must also strictly construe the removal statute... [W]hen Congress has decided to bring other non-federal courts within the ambit of § 1441, it has enacted legislation expressly doing so... Congress has never enacted legislation ... authorizing the removal of actions brought in Tribal courts."); 29A Fed. Proc., *Lawyer's Edition 2d* § 69:9 (West 1998) ("Federal courts should, as a matter of comity, permit actions commenced in a Native American tribal court to proceed there. Thus, in the absence of legislation either bringing tribal courts within the meaning of 'state court' in 28 USCA § 1441 or separately authorizing the removal of actions brought in tribal courts, a tribal court is not a state court for purposes of § 1441."); Frank Pommersheim, *"Our Federalism" in the Context of Federal Courts and Tribal Courts: An Open Letter to the Federal Courts' Teaching and Scholarly Community*, 71 U. Colo. L.Rev. 123, 160 (Winter 2000) ("The plain language of [§ 1441] makes no reference to tribal courts and would appear to foreclose removal of a federal claim asserted in tribal court to federal court.");[1] Pace, Julie A., *Enforcement of Tribal Law in Federal*

---

**1.** The author of this article noted that at the time of the passage of the removal statutes, tribal courts were either nonexistent or not significant and therefore were not even on the screen in the original removal context. Removal is, therefore, totally improper in

the tribal court context. Accordingly, with the growth and development of tribal courts, the removal statutes simply need to be amended to include tribal courts within their purview.

*Court: Affirmation of Indian Sovereignty or a Step Backward Towards Assimilation,* 24 Ariz. St. L.J. 435, 464 (Spring 1992) ("Tribal courts are neither mentioned in the legislative history nor in the removal statute. When Congress has been faced with the issue of removal of cases from non-state courts, it generally has enacted a statute that expressly provides for removal from those specific jurisdictions. Such express congressional intent to allow cases to be removed from tribal courts to federal courts appears to be lacking."); *cf. Becenti v. Vigil,* 902 F.2d 777, 780 (10th Cir.1990) (holding that 28 U.S.C. § 1442(a)(1), which includes language limiting removal to actions commenced in "State court," does not extend to an action in the tribal court, reasoning that "where Congress has intended to permit removal from courts other than state courts it has expressly said so.").

In response to plaintiff's motion, Carmel has cited no case in which any court has held or suggested that removal from tribal court is authorized under § 1441 (and the court is aware of none). It does suggest that the Supreme Court in *El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999), "opened the door to consideration of removal" of a case from tribal court even in the absence of a statute authorizing such removal; but this court, having carefully reviewed the *Neztsosie* opinion, perceives no such opening[2] and is instead of the

---

Yet this suggestion may be a little too glib. It is quite possible, for example, to argue that the unique relationship of tribal courts to the federal government requires the kind of deference suggested by Justice Marshall in the *Iowa Mutual* case: "tribal courts play a vital role in tribal self-government ... and the Federal Government has consistently encouraged their development." This is also related to the Court's sensitivity ... toward not wanting to engage in "direct competition" with tribal courts. Thus, removal can be seen as antithetical to federal policy supporting tribal court development. This line of reasoning becomes increasingly formidable when it is recalled how the Court in *Iowa Mutual* treated diversity jurisdiction in the tribal court context as significantly different than in the off-reservation context.

Frank Pommersheim, *"Our Federalism" in the Context of Federal Courts and Tribal Courts: An Open Letter to the Federal Courts' Teaching and Scholarly Community,* 71 U. Colo. L.Rev. 123, 162–63 (Winter 2000); *see infra* at pp. 776–779 for discussion of *Iowa Mutual* and tribal exhaustion.

2. As plaintiff notes, *Neztsosie* was not a removal case. In determining whether the tribal exhaustion doctrine applied to a claim brought in tribal court under the Price Anderson Act, the Court in *Neztsosie,* after noting that Congress had specifically provided for removal of Price Anderson Act claims

from state court and had in effect provided for complete federal preemption of Price Anderson Act claims, opined that in view of the nature of the considerations that prompted enactment of the Act in the first place, it was implausible "that Congress would have intended to force defendants to remain in tribal courts." *Neztsosie,* 526 U.S. at 487, 119 S.Ct. at 1438; *see id.,* 119 S.Ct. at 1438 ("The congressional reasoning sketched above is no less forceful when plaintiffs choose tribal courts; leaving such claims in these courts would just as effectively thwart the Act's policy of getting such cases into a federal forum for consolidation, as leaving them in state forums would do."). The Court considered it likely that Congress had failed to provide for removal of Price Anderson Act cases from tribal court as a result of inadvertence, stating,

We have not been told of any nuclear testing laboratories or reactors on Indian lands, and if none was brought to the attention of Congress, either, Congress probably would never have expected an occasion for asserting tribal jurisdiction over claims like these. Now and then silence is not pregnant.

*Id.* at 487, 119 S.Ct. at 1439. The Court thus concluded that the tribal court litigation had been properly enjoined. *Id.* at 487–88, 119 S.Ct. at 1439. The Court did not hold that removal from tribal court was available under the Price Anderson Act despite Congress's

view that there can be no proper removal from tribal court under § 1441. For that reason, plaintiff's request for remand is well taken.

■ Her motion is well taken for the further reason that this case, even if properly removed, should be remanded since it is subject to the tribal exhaustion rule. Under the tribal exhaustion rule, as formulated by the Supreme Court in *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), "when a colorable claim of tribal court jurisdiction has been asserted, a federal court may (and ordinarily should) give the tribal court precedence and afford it a full and fair opportunity to determine the extent of its own jurisdiction over a particular claim or set of claims." *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Housing Auth.*, 207 F.3d 21, 31 (1st Cir. 2000); *see also Bowen v. Doyle*, 230 F.3d 525, 529 (2d Cir.2000) ("when the jurisdiction of the tribal court is challenged, 'the Tribal Court itself' must be permitted to determine the issue 'in the first instance.'") (quoting *National Farmers*, 471 U.S. at 856, 105 S.Ct. 2447, 85 L.Ed.2d 818); *Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 65 (2d Cir. 1997) (under the doctrine of exhaustion of tribal remedies, "parties who challenge, under federal law, the jurisdiction of a tribal court to entertain a cause of action must first present their claim to the tribal court before seeking to defeat tribal juris-

diction in any collateral or parallel federal court proceeding.").

■ The tribal exhaustion requirement is not jurisdictional, but rather is a "prudential" rule pursuant to which a federal court, in view of comity considerations, "should to stay its hand 'until after the Tribal Court has had a full opportunity to determine its own jurisdiction.'" *Strate v. A-1 Contractors*, 520 U.S. 438, 449, 117 S.Ct. 1404, 1411, 137 L.Ed.2d 661 (1997) (quoting *National Farmers*, 471 U.S. at 857, 105 S.Ct. at 2454); *Iowa Mutual*, 480 U.S. at 16 n. 8, 107 S.Ct. at 976 n. 8 (stating that "[e]xhaustion is required as a matter of comity, not as a jurisdictional prerequisite"). This rule is based on "the Federal Government's longstanding policy of encouraging tribal self-government," *Iowa Mutual*, 480 U.S. at 14, 107 S.Ct. at 975, and "reflects the fact that Indian tribes retain 'attributes of sovereignty over both their members and their territory' to the extent that sovereignty has not been withdrawn by federal statute or treaty," *id*, at 14, 107 S.Ct. at 975 (quoting *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)); *see also National Farmers*, 471 U.S. at 856, 105 S.Ct. at 2454 ("Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination."). Thus, while the federal courts ultimately have jurisdiction to determine the limits of a tribal court's jurisdiction, the tribal exhaustion rule holds that tribal courts, which "play a vital role in tribal self-government," must be permitted the first opportunity to resolve

failure to provide for removal; rather, the Court held only that exhaustion of tribal remedies was not required. *See infra* at pp. 776–779 for discussion of tribal exhaustion. Moreover, the considerations that led to the Court's conclusion that Congress had intended that all Price Anderson Act claims be litigated in federal court are not present with

respect to the Truth in Lending Act, as to which there is no complete federal preemption. *See Greer v. MAJR Financial Corp.*, 105 F.Supp.2d 583, 590 (S.D.Miss.2000) (Truth in Lending Act does not completely preempt state law). Accordingly, Carmel's reliance on *Neztsosie* in support of its position in this case is not well founded.

challenges to their jurisdiction without federal court interference.[3] *Iowa Mutual,* 480 U.S. at 14, 107 S.Ct. at 976; *Strate,* 520 U.S. at 451, 117 S.Ct. at 1412 (Court in *Iowa Mutual* held that "[r]espect for tribal self-government made it appropriate 'to give the tribal court a full opportunity to determine its own jurisdiction.'") (citations omitted); *Basil Cook Enters.,* 117 F.3d at 65 (noting that the exhaustion requirement "promotes tribal autonomy and dignity"). This is so whether the federal court's jurisdiction is sought to be invoked on the basis of a federal question under 28 U.S.C. § 1331, or diversity of citizenship under § 1332. *See Strate,* 520 U.S. at 451, 117 S.Ct. at 1412 (respect for tribal self-government "[is] equally in order whether federal-court jurisdiction rest[s] on § 1331 (federal question) or on § 1332 (diversity of citizenship)"); *Iowa Mutual,* 480 U.S. at 16, 107 S.Ct. at 976 ("In diversity cases, as well as federal-question cases, unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs."); *Tillett v. Lujan,* 931 F.2d 636, 640 (10th Cir.1991) (tribal exhaustion rule provides that "as a matter of comity, a federal court should not exercise jurisdiction over cases arising under its federal question or diversity jurisdiction, if those cases are also subject to tribal jurisdiction, until the parties have exhausted their tribal remedies.").

■ In the case at bar, Carmel argues that exhaustion of tribal remedies is not required since application of the *Montana* rule compels the conclusion that plaintiff's claims are not subject to tribal jurisdiction and further because the circumstances of this case, and most particularly the fact of the plaintiff's employment by the tribal court, warrant rejection of the tribal exhaustion doctrine in this case, even if it were otherwise applicable. The court finds no merit in either position.

In *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Court held that although there is generally no tribal jurisdiction over non-Indians for activities off the reservation, or on non-Indian fee lands, in the absence of a federal statute or treaty granting such authority, there are specific circumstances in which such jurisdiction does exist:

A tribe may regulate, through taxation, licensing or other means, the activities of nonmembers who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. at 565–66, 101 S.Ct. 1245. *See TTEA v. Ysleta del Sur Pueblo,* 181 F.3d 676, 684 (5th Cir.1999) (recognizing that while "[a] tribal court generally does not have jurisdiction over non-Indian defendants[,][a] tribe may regulate the activities of nonmembers who enter consensual relationships with the tribe or its members through commercial dealing, contracts, leases, or other arrangements" unless the civil jurisdiction of the tribal courts has been limited by congressional act) (citations omitted).

---

**3.** The Court in *National Farmers* held that "[t]he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331." *National Farmers,* 471 U.S. at 852–53, 105 S.Ct. at 2452 ("The District Court correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction.").

Later, in *Iowa Mutual,* the Court explained that because " '[t]ribal authority over the activities of non-Indians on [nonalienated] reservation lands is an important part of tribal sovereignty,' ... 'civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.' " *Iowa Mutual,* 480 U.S. at 18, 107 S.Ct. at 977; *see Ninigret Dev. Corp.,* 207 F.3d at 32 ("Civil disputes arising out of the activities of non-Indians on reservation lands almost always require exhaustion if they involve the tribe (or a tribe member)"); *see also State of Nevada v. Hicks,* 196 F.3d 1020, 1024–27 (9th Cir.2000) (recognizing " 'a strong geographic component' distinguishing incidents occurring on Indian-owned land from those on non-Indian owned land," and concluding that "[w]here the incidents underlying the ... case occurred on Indian-owned, Indian-controlled land, over which the Tribe retained its right to exclude nonmembers," the applicable rule was that of *Williams v. Lee:* "where the underlying incidents occur on Indian-owned land, tribal court jurisdiction is presumed unless affirmatively limited by an act of Congress.") (citing *Williams v. Lee,* 358 U.S. 217, 222, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), in which the Court stated that it had "consistently guarded the authority of Indian governments over their reservations.... If this power is to be taken away from them, it is for Congress to do it.").

Carmel submits that "it has entered into no contracts or agreements on the reservation with the tribe or any of its members," and has instead merely made a "routine purchase of consumer paper from another lender, which, by pure happenstance, included a debt incurred by a member of the tribe...." and that consequently, under the rule enunciated by the Supreme Court in *Montana,* it is subject neither to the jurisdiction of the tribal court nor to the tribal exhaustion rule. The fact is, however, that the plaintiff's claims in this case are based on activities of a nonmember that occurred on the reservation as a result of which such nonmember entered into a consensual relationship with plaintiff, a member of the Choctaw tribe, through a contract; and Carmel's alleged liability to plaintiff is premised on its alleged status as a successor in liability to that nonmember who is alleged to have gone onto the reservation to sell the plaintiff a satellite system and to have misrepresented and/or concealed material terms of the transaction from plaintiff. Given these facts, then, and despite the fact that Carmel may not have *itself* engaged in conduct on the reservation and may not *itself* have directly contracted with the plaintiff to sell or finance anything, and regardless of the viability of the theory of liability advanced by plaintiff against Carmel, the court is of the opinion that she has nevertheless asserted a colorable claim of tribal court jurisdiction [4] which should first be addressed to the tribal court.[5]

4. *Cf. In re Celotex Corp.,* 124 F.3d 619, 628 (4th Cir.1997) (holding that "a non-resident defendant corporation not otherwise subject to personal jurisdiction in the forum state becomes so by virtue of its succeeding to a corporation that was subject to personal jurisdiction in the forum state."); *Duris v. Erato Shipping, Inc.,* 684 F.2d 352 (6th Cir.1982) (plaintiff could establish personal jurisdiction over surviving corporation to a merger which lacked contacts with forum where its constituent corporation had the requisite contacts and surviving corporation was liable by law "for all claims against the constituent corporation"); *but cf. Johnston v. Pneumo Corp.,* 652 F.Supp. 1402, 1406 (S.D.Miss.1987) (declining to hold that contacts with a forum may be attributed or imputed to a successor corporation simply because that corporation purchases assets and liabilities from another).

5. This court, of course, expresses no opinion as to the propriety of an exercise of jurisdiction by the tribal court under these circum-

■ In reaching this conclusion, the court is mindful of Carmel's argument that "the particular facts and circumstances of this case ... raise serious questions about whether Carmel can fairly defend itself in this particular [tribal] forum [which] would be of equal concern to a similarly-situated Indian defendant." Specifically, it submits that there exists a reasonable question as to the impartiality, or appearance of impartiality, of the tribal forum because the plaintiff herein is an employee of the tribal court (an assistant clerk in the Civil Division), and because one of plaintiff's attorneys, Brian Dover, is the husband of an Assistant Attorney General for the State of Mississippi who orchestrated an investigation of companies that have sold satellite systems to Indians on the Choctaw Reservation. According to Carmel, these circumstances counsel in favor of this court's retention of jurisdiction since this is a neutral forum in which both parties' rights would be adequately protected. The court, however, rejects Carmel's position.

In *National Farmers*, the Supreme Court identified three narrow situations in which the tribal exhaustion rule would not require litigants to first press their jurisdictional arguments in tribal court: "[1] where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or [2] where the action is patently violative of express jurisdictional prohibitions, or [3] where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *National Farmers*,

471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21 (citation and internal quotations omitted). Carmel does not specifically contend that any one of these exceptions applies, but instead asserts more generally that the "circumstances" of this case would warrant the court in declining to require tribal court exhaustion.

In *Iowa Mutual*, the Supreme Court expressly held that protection against local bias and incompetence is not one of the exceptions recognized in *National Farmers* and is not a basis for avoiding application of the tribal exhaustion doctrine. *Iowa Mutual*, 480 U.S. 9, 19, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987) ("The alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement established in *National Farmers Union*, 471 U.S. at 856, n. 21, 105 S.Ct. at 2454, n. 21, and would be contrary to the congressional policy promoting the development of tribal courts. Moreover, the Indian Civil Rights Act, 25 U.S.C. § 1302, provides non-Indians with various protections against unfair treatment in the tribal courts.").

Based on this statement in *Iowa Mutual*, some courts have concluded that there is no "bias" exception to the tribal exhaustion doctrine, and that a claim of bias must be litigated in tribal court. *See, e.g., Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1171 (10th Cir.1992) (concluding that *Iowa Mutual* "required a non-Indian party alleging bias and incompetence on the part of the tribal court to

---

stances, but holds merely that the tribal court must be given the first opportunity to address the issue of its jurisdiction. In fact, this court would note that in her memoranda in connection with her motion to remand, plaintiff points out that the facts relating to Carmel's potential liability have yet to be fully developed, and she implies that Carmel's involvement in the transaction of which she complains may not be as limited as it suggests.

These facts are appropriately to be developed in the tribal court. *See National Farmers*, 471 U.S. at 856, 105 S.Ct. at 2454 ("Exhaustion [is] appropriate ... because 'Congress is committed to a policy of supporting tribal self-government .... [which] favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.' ") (citations omitted).

litigate these issues in tribal court" since allegations of bias and incompetence were held by the Court in *Iowa Mutual* not to trigger any *National Farmers* exceptions to exhaustion requirement); *Atkinson Trading Co. v. Shirley*, 210 F.3d 1247, 1252 n. 4 (10th Cir.2000) (holding that "if a nonmember party exhausting its remedies within the tribal system faces a fundamental unfairness or bias against it, the district court ought not give clear error discretion to the tribal court's findings of facts in its review of the tribal court's decision."). Other courts have treated assertions of bias by the tribal court as a subcategory of "bad faith," but have held that for this exception to tribal exhaustion to apply, there must be affirmative evidence of bias, and not merely unsupported speculation that a defendant, as a non-Indian, will not receive fair treatment in tribal court. *See, e.g., Ninigret Dev. Corp.*, 207 F.3d at 34 ("The unsupported averment that non-Indians cannot receive a fair hearing in a tribal court flies in the teeth of both congressional policy and the Supreme Court precedents establishing the tribal exhaustion doctrine. The requirements for this exception are rigorous: absent tangible evidence of bias—and none has been proffered here—a party cannot skirt the tribal exhaustion doctrine simply by invoking unfounded stereotypes."); *Davis v. Mille Lacs Band of Chippewa Indians*, 193 F.3d 990, 992 (8th Cir.1999) (rejecting argument "that the exhaustion requirement should be excused because the Tribal Court [was] biased and ... exercised jurisdiction over her case in bad faith[,] [since,] [h]aving carefully reviewed the record, ... there [was] no support for Davis's claim of bias or bad faith on the part of the tribal court system"); *Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Reservation*, 27 F.3d 1294, 1301 (8th Cir.1994) ("Absent any indication of bias, we will not presume the Tribal Court to be anything other than competent and impartial.").

This court need not resolve which of these is the correct approach, for in no event is there a basis in this case for declining to require tribal court exhaustion. Simply put, the fact that the plaintiff is employed by the tribal court is no bar to her resorting to that forum for redress of claims properly within that court's jurisdiction any more than an employee of this court would be foreclosed from initiating litigation in this forum.[6] The Tribal Court has adopted Rules of Ethics, just as this court, which are designed to avoid any appearance of impropriety in that court's adjudication of claims before it, and any situation which might suggest an appearance of impropriety may be brought to the attention of that court.[7] Moreover, the plaintiff has provided unrefuted evidence showing that her employment by the tribal court creates no obvious conflict or potential for bias. Accordingly, this court does not consider that the circumstances identified by Carmel provide an adequate basis for declining application of the tribal exhaustion rule.

---

**6.** If, in the end, following resolution of the tribal court litigation, Carmel were dissatisfied and was able to demonstrate to a federal court that a problem of evident bias went unaddressed, that is a circumstance which the federal court could take into account in reviewing the tribal court's decisions. *See Atkinson Trading Co. v. Shirley*, 210 F.3d 1247, 1252 n. 4 (10th Cir.2000).

**7.** This court perceives no impropriety in plaintiff's representation by attorney Dover; but even if that were arguably a legitimate basis for concern, that would not be a reason to terminate tribal court proceedings. Rather, if any remedy were in order (and the court would again stress that it discerns no basis for any relief), the only arguably appropriate remedy would be disqualification of her attorney.

In conclusion, the court is of the opinion that this case was improperly removed and for that reason, that it should be remanded. And even if the case had been properly removed, the court concludes that the tribal exhaustion doctrine applies, and that in the circumstances of this case, remand is appropriate.

Therefore, it is ordered that plaintiff's motion to remand is granted.