A04A1646. J & M AIRCRAFT MOBILE T HANGARS, INC. et al.
v. JOHNSTON COUNTY AIRPORT AUTHORITY.
(605 SE2d 611)

ELDRIDGE, Judge.
On September 1, 2001, plaintiff-appellee-judgment creditor Johnston County Airport Authority (the "Airport") filed its verified complaint against defendant-appellant-judgment debtors J & M Aircraft Mobile T Hangars, Inc. ("J & M Hangars") in the Superior Court of Johnston County, North Carolina, averring J & M Hangars' failure to pay it commissions and interest totaling $37,000, such commissions as earned upon the resale of aircraft hangars which J & M Hangars built for the Airport. On February 14, 2002, the Airport filed an authenticated copy of the North Carolina judgment in the State Court of Carroll County ("state court") under OCGA § 9-12-130 et seq., the Uniform Enforcement of Foreign Judgments Law. Thereafter served with post-judgment discovery, J & M Hangars filed a motion for a protective order in the state court challenging the validity of service of process in North Carolina and the North Carolina judgment as not properly domesticated in Georgia. Such motion was denied, J & M Hangars, joined by the companies' principal and former officer, defendant-appellant-judgment debtors Deryl and Judy Perry, through initial counsel, entered into a consent order filed on April 29, 2003. Thereunder, the state court stayed the enforcement of the North Carolina default judgment pending the outcome of J & M Hangars'

action to open the default in North Carolina, and, in the event of an unfavorable result, the Perrys and J & M Hangars agreed to joint and several liability under the default judgment and to satisfy such liability not later than ten days after the "lifting of the stay." On July 11, 2003, the North Carolina trial court refused to open the default, "order[ing] any and all stays of the Georgia action . . . terminated and vacated." In state court, the Airport timely moved for issuance of a writ of fieri facias and sanctions upon the consent order entered by the parties in September 2003. On January 7, 2004, J & M Hangars, pro se, under 28 USC § 1441 (b)[1] sought removal of the underlying action from the state court to the Tribal Court of the State of Northern District ("Tribal Court") of the Georgia Tribe of Eastern Cherokee, asserting a lack of subject matter jurisdiction. On February 5, 2004, following a January 21 hearing, the state court denied the Perrys' notice of removal, domesticated the underlying judgment, and ordered the enforcement of the April 2003 consent order. Through new counsel on appeal,[2] the Perrys for the first time contend that the state court lacked subject matter jurisdiction, the Airport's action against them to enforce a foreign judgment as civil litigation involving Cherokee Indians living on tribal land. Alternatively, in the event this Court should find jurisdiction in the state court, the Perrys contend that the state court erred by enforcing the consent order of the parties before "the appeal of the North Carolina action [was] complete."

The evidence of record shows that the Perrys are nonreservation Indians; that the dispute at issue did not arise in Cherokee Indian country; and that the consent order of the parties was properly consistent with public policy enforced upon its express terms. Accordingly, we disagree and affirm.

1. While the Perrys erred in grounding their notice of removal upon 28 USC § 1441 authorizing removal to districts courts only, id., under the Civil Practice Act "we judge a pleadings [sic] by its contents, not by its name." (Citations and punctuation omitted.) *Herringdine v. Nalley Equip. Leasing*, 238 Ga. App. 210, 211 (1) (517 SE2d 571) (1999). Thus, we address the validity of the Perrys' claim that, as Cherokee Indians living on "traditional tribal territory" in Carroll County, they are entitled to remove the underlying action to the

---

[1] Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.
28 USC § 1441 (b).

[2] Upon their consent, the state court granted trial counsel's motion to withdraw as individual counsel for the Perrys. Such counsel continued to represent J & M Hangars.

Tribal Court of the Georgia Tribe of the Eastern Cherokee, subject matter jurisdiction as in that court alone. See OCGA § 44-12-300 (a) (1) ("The State of Georgia officially recognizes as legitimate American Indian tribes of Georgia . . . [t]he Georgia Tribe of [the] Eastern Cherokee.").

The Perrys concede that the state court correctly ruled that their right to contest personal jurisdiction over them in the state court was waived upon their personal appearance therein. The defense of lack of personal jurisdiction may be waived if not timely asserted. *In the Interest of S. K. L.*, 199 Ga. App. 731, 734 (2) (b) (405 SE2d 903) (1991). Nonetheless, they contend that the order complained of was void and unenforceable against them for want of subject matter jurisdiction, such defense as proper even if not raised below. See OCGA § 9-11-12 (h) (3); *Dept. of Human Resources v. Nation*, 265 Ga. App. 434, 439 (2) (594 SE2d 383) (2004).

We recognize that "[t]ribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development. Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, their civil jurisdiction is not similarly restricted." (Citations and footnote omitted.) *Iowa Mut. Ins. Co. v. LaPlante*, 480 U. S. 9, 14-15 (II) (107 SC 971, 94 LE2d 10) (1987). However, state courts are divested of jurisdiction as a matter of law only when exercised over Indians or activities *on* Indian lands,[3] this to prevent interference with tribal sovereignty and self-government. Id. at 15. Otherwise, state law lies. See *DeCoteau v. District County Court for the Tenth Judicial Dist.*, 420 U. S. 425, n. 2 (95 SC 1082, 43 LE2d 300) (1975) (termination of Indian reservation or parts thereof by Act of Congress vests jurisdiction in state courts over non-Indian land thus resulting); compare *Mattz v. Arnett*, 412 U. S. 481 (93 SC 2245, 37 LE2d 92) (1973); *Seymour v. Superintendent of Washington State Penitentiary*, 368 U. S. 351 (82 SC 424, 7 LE2d 346) (1962) (reservation status may survive opening of a reservation to non-Indian settlers).

By the Treaty of New Echota of 1835, 7 Stat. 478, in consideration of monetary compensation and a grant of new lands in the west, the

---

[3] Any tract of land set apart as an Indian reservation is "Indian Country." *Donnelly v. United States*, 228 U. S. 243, 269 (4) (33 SC 449, 57 LE2d 820) (1913); see also 18 USC § 1151 (" 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all independent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.").

Cherokee nation ceded and relinquished all its right, title, and interest in Cherokee tribal lands east of the Mississippi, these as in North Carolina,[4] South Carolina, Georgia, and Tennessee. *In re McCoy*, 233 FSupp. 409, 413-414 (E.D. N.C. 1964).[5]

> The Congress, by entering into the [T]reaty of New Echota, dissolved the tribal government of the Cherokees east of the Mississippi and re-established it west of the Mississippi. By that treaty members of the Nation who remained were given the benefit of, and made subject to the laws of the [S]tate [of North Carolina].

Id. at 414. No different result should obtain as to the members of the Cherokee Nation remaining in Georgia. See id. ("[T]he state government derives it[s jurisdiction] from the [T]reaty of New Echota."); see also *DeCoteau v. District County Court for the Tenth Judicial Dist.*, supra; see also *Camp v. Sellers & Co.*, 158 Ga. App. 646, 648 (2) (281 SE2d 621) (1981) ("[J]udicial notice must be taken of a treaty and . . . it will predominate over any statutory provision of the State of Georgia."). Further, we point out that the State of Georgia acquired and organized Carroll County, the place of the Perrys' residence, not from the Cherokees, but from the Creek Indians in 1826, 1826 Ga. Act No. 315;[6] William C. Dawson, Compilation of Georgia Laws 1819-1829 (Milledgeville: Grantland and Orme, 1831), pp. 132-133, under the Treaty of Indian Springs of 1825. 7 Stat. 237.[7] Personal jurisdiction over the Perrys in the state court as waived and subject matter jurisdiction vested therein, the state court did not err in refusing to

---

[4] The Cherokee Indian Reservation presently located in western North Carolina, principally in Swain County, exists upon grant of the State of North Carolina given approximately 50 years after the Treaty of New Echota. Having lost their interest in tribal lands and any right to self-rule under the Treaty, such grant of a reservation did not affect the legal status of Cherokee Indians remaining in North Carolina, these as subject to the laws of North Carolina. *In re McCoy*, 233 FSupp. 409, 412-413 (E.D. N.C. 1964).

[5] Prior to the ratification of the Treaty of New Echota, the United States Supreme Court invalidated Georgia legislation which sought to annex lands that had been set aside for Cherokee Indians living in Georgia by federal treaties. *Worcester v. State of Georgia*, 31 U. S. 515 (8 LE 483) (1832). Such lands were to be added to Carroll County, DeKalb County, Gwinnett County, Hall County, and Habersham. Id. at 525-526. The Georgia laws involved are set out extensively in *Worcester*. Id. at 521-528. The principal treaties involved are found at 7 Stat. 18, 39.

[6] The counties of Coweta, Troup, Muscogee, and Lee were also acquired and organized under this Act. Id.

[7] Among others, the Treaty was signed by Head Chief of the Cowetaus General William McIntosh. Chief McIntosh was later killed by a faction of his own people for doing so. Allen D. Candler and Clement A. Evans, Cyclopedia of Georgia, I (State Historical Association, 1906), p. 323.

remove the instant action to the Tribal Court of the Georgia Tribe of the Eastern Cherokee.

2. Neither did the state court err in enforcing the consent order of the parties. "[A] proper consent order may be treated as a binding agreement, enforceable as a contract." *Collins v. Collins*, 148 Ga. App. 103, 105 (2) (B) (250 SE2d 870) (1978); *Walker v. Virtual Packaging*, 229 Ga. App. 124, 127 (3) (493 SE2d 551) (1997). "Construction and interpretation of a contract are matters of law for the court." (Punctuation and footnote omitted.) *Gulf States Underwriters of La. v. Bennett*, 260 Ga. App. 699, 703 (3) (580 SE2d 550) (2003). Absent ambiguity, we must interpret a contract for the plain meaning of its terms. OCGA § 13-2-3; *Reuss v. Time Ins. Co.*, 177 Ga. App. 672, 673 (340 SE2d 625) (1986).

The consent order in issue provided for the termination of the stay it granted upon the occurrence of events in the alternative. Pertinently, the consent order provided that "the stay provided herein shall terminate and the other provisions hereof shall take effect upon the unsuccessful conclusion of the appeal or action to set aside in North Carolina or the expiration *or vacation of the stay in the North Carolina court.*" (Emphasis supplied.) The Perrys, among other things, expressly agreed that the stay granted by the consent order would terminate upon action in the North Carolina court vacating the stay. The North Carolina court took such action. Accordingly, the state court did not err in enforcing the consent order, the Perrys as plainly bound by the terms thereof and these consistent with the legitimate ends of judicial economy. OCGA § 13-2-3; *Walker v. Virtual Packaging*, supra; *Reuss v. Time Ins. Co.*, supra.

*Judgment affirmed. Ruffin, P. J., and Adams, J., concur.*

DECIDED SEPTEMBER 30, 2004.

*Jack F. Witcher, Daniel B. Greenfield*, for appellants.
Deryl Perry, *pro se.*
Judy Perry, *pro se.*
*David S. DeLugas*, for appellee.